DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Jeffrey K. McMillen has appealed from a decision of the Summit County Court of Common Pleas that convicted him of aggravated robbery and felonious assault. This Court affirms in part, reverses in part, and remands for further proceedings.
 I {¶ 2} On May 16, 2002, the Summit County Grand Jury indicted Appellant on one count of aggravated robbery, in violation of R.C.2911.01(A)(3); one count of robbery, in violation of R.C. 2911.02(A)(2); and one count of felonious assault, in violation of R.C. 2903.11(A)(1). Appellant pleaded not guilty to each count and waived his right to a jury trial. Prior to trial, Appellant was evaluated for competency to stand trial and underwent two psychiatric evaluations. The parties stipulated to the first psychiatric diagnosis presented by the Psycho Diagnostic Clinic, but the defense refused to stipulate to the clinic's findings presented in the second evaluation. The trial court found Appellant competent to stand trial and the matter proceeded to a bench trial. The trial court found Appellant guilty of the charge of aggravated robbery and felonious assault; the charge of robbery merged with the charge of aggravated robbery. The journal entry reflects that Appellant was sentenced to serve seven years for the crime of aggravated robbery and six years for the crime of felonious assault. The trial court ordered the sentences to run concurrently; his sentences for felonious assault and aggravated robbery were ordered to run consecutive to his sentence in prior criminal case.
 {¶ 3} Appellant has timely appealed, asserting three assignments of error, some of which we have consolidated to facilitate review.
 II Assignment of Error Number One
"THE TRIAL COURT ERRED IN NOT GRANTING [APPELLANT'S] ORAL MOTION FOR DIRECTED VERDICT PURSUANT TO [CRIM.R. 29] BECAUSE [THE STATE] PRESENTED INSUFFICIENT EVIDENCE IN ORDER TO MEET EACH AND EVERY ELEMENT OF THE OFFENSES OF AGGRAVATED ROBBERY AND FELONIOUS ASSAULT."
 Assignment of Error Number Two
"THE TRIAL COURT ERRED IN FINDING [APPELLANT] IS GUILTY OF AGGRAVATED ROBBERY AND FELONIOUS ASSAULT BECAUSE SUCH A FINDING IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 4} In Appellant's first and second assignments of error, he has argued that the trial court erred when it overruled his Crim.R. 29 motion because there was insufficient evidence to find him guilty of felonious assault and aggravated robbery. He has further contended that his conviction was against the manifest weight of the evidence. We disagree.
 {¶ 5} As an initial matter, this Court notes that the sufficiency and manifest weight of the evidence are legally distinct issues. State vManges, 9th Dist. No. 01CA007850, 2002-Ohio-3193, ¶ 23, citing Statev. Thompkins (1977), 78 Ohio St.3d 380, 386. Sufficiency tests whether the prosecution has met its burden of production at trial, whereas a manifest weight challenge questions whether the prosecution has met its burden of persuasion. Manges, 2002-Ohio-3193, at ¶ 25. In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten
(1986), 33 Ohio App.3d 339, 340.
 {¶ 6} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. Id. This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant.Otten, 33 Ohio App.3d at 340.
 {¶ 7} In the instant matter, Appellant was convicted of aggravated robbery, a violation of R.C. 2911.01(A)(3). That section provides, in pertinent part:
"(A) No person, in attempting or committing a theft offense, as defined in [R.C. 2913.01], or in fleeing immediately after the attempt or offense, shall do any of the following:
"* * *
"(3) Inflict, or attempt to inflict, serious physical harm on another."
 {¶ 8} Appellant was also found guilty of the crime of felonious assault, a violation of R.C. 2903.11(A)(1). That section provides:
"(A) No person shall knowingly do either of the following:
"(1) Cause serious physical harm to another or to another's unborn [.]"
 {¶ 9} The term "serious physical harm," which is employed in both R.C. 2911.01 and R.C. 2903.11, is defined as "[a]ny physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement." R.C. 2901.01(A)(5)(d).
 {¶ 10} Appellant has contended that the state failed to prove that he inflicted or attempted to inflict serious physical harm upon Mr. Carpenter, the victim, as required by R.C. 2903.11 and R.C. 2911.01. Appellant has further contended that the state failed to prove that the victim actually suffered serious physical harm. Appellant has argued that the state "only supplied the trial court with lay witness testimony and stipulated medical records. Although medical records were trial court [sic], neither the trial court, nor this Court may interpret said medical records to determine whether or not the injuries sustained by [the victim] were serious." After reviewing the record, we disagree with Appellant's arguments.
 {¶ 11} At trial, Mr. Charles Carpenter, the victim, presented testimony regarding the events that took place on April 20, 2002. He testified that prior to the incident he had never met Appellant. Mr. Carpenter stated that he rode his bike to the towpath located in Barberton, Ohio, to fish. After fishing for a couple of hours, Mr. Carpenter testified that he was approached by Appellant, who was carrying a stick in his hand. Mr. Carpenter described the stick as being "maybe an inch and a half thick, a little less than three-foot long." Mr. Carpenter stated that Appellant was tapping his hand with the stick when Appellant told him: "Well, dude, you done fucked up." Mr. Carpenter stated that he asked Appellant "how did I fuck up, I'm just standing here [fishing]." Appellant, Mr. Carpenter testified, responded with what seemed to him as "nonsense" because Appellant told him: "You think you're so big you got a cell phone, I'm not afraid of your cell phone[.]"
 {¶ 12} During their conversation, Mr. Carpenter stated that Appellant "picked the stick up like he was threatening [him] with it." Appellant then told Mr. Carpenter that "I'm going to take what you got and there ain't nothing you can do about it." Mr. Carpenter testified that he attempted to get on his bike and leave the towpath, but Appellant grabbed his bike by the handle bars and then "doubled up his fist." Appellant then told Mr. Carpenter: "I want you to reach in your pocket right now and take out your money and hand it to me." Mr. Carpenter stated that he responded to Appellant's request by taking his money out of his pocket, along with a pocket knife. Mr. Carpenter explained that after he took the money and pocket knife out of his pocket:
"Well, [Appellant] stepped away from the bike as I was reaching up with the knife to show him, you know, it wasn't just money in my hand. I figured that would be enough.
"And that's when [Appellant] put the stick in his opposite hand and pulled up like he was going to swing it at me and when he flexed up I grabbed the arm that he had his hand — I told him, `I don't know what's on your mind, but it's not going to happen.'"
 {¶ 13} Mr. Carpenter testified that he then stabbed Appellant in the arm with his pocket knife as Appellant attempted to hit him with the stick. Mr. Carpenter explained that Appellant "dropped the stick and backed off and just turned around and started running down the towpath." Mr. Carpenter stated that he saw Appellant join two other people, a man and a woman, at the end of the towpath. After Appellant fled, Mr. Carpenter said he tried to call the police on his cell phone, but he could not receive a signal. Mr. Carpenter waited until it was "clear" and he got on his bike, and rode back the way he had originally come down the towpath; he rode in the same direction in which Appellant had fled. As he was riding his bike down the towpath, "[Appellant] and the woman blocked [his] path and started yelling things at [him]." Mr. Carpenter further explained:
"Well, [Appellant] was blocking my way from riding through and just about five seconds after [Appellant] blocked my way, that's when I was hit in the shoulder and knocked off my bike.
"* * *
"Well, I didn't fall all the way down, I stumbled on my right foot a couple of times so I wouldn't fall and then when I turned around to see who it was, you know, what was going on, the younger guy had the bar up in the air again getting ready to swing; so, I tried to run."
 {¶ 14} Mr. Carpenter stated that as he ran through the towpath, the "younger guy" followed him and hit him several times in the arm and rib cage with a steel bar. Mr. Carpenter testified that he tried to prevent the "younger guy" from hitting him, but he couldn't stop the "young guy" from hitting him because his shoulder was broken during the initial attack. Mr. Carpenter stated that he grabbed the end of the steel bar and even though he was seriously injured, the "younger guy" yelled for help. Appellant responded to the "younger guy's" cry for assistance by stepping "around from behind [the younger guy] and hit[ting] [Mr. Carpenter] across the face and the forehead with the four-way lug wrench."[1] As Mr. Carpenter was falling to the ground from the blow dealt by Appellant, the "younger guy" broke his leg with the steel bar. Mr. Carpenter testified that he tried to get off the ground, but he saw that his foot was "all twisted around backwards" so he just sat back because he "was just waiting for them to finish [him] off[.]"
 {¶ 15} Mr. Carpenter testified that after the attack, the "younger guy" told Appellant to "[g]rab [Mr. Carpenter's] cell phone so he can't call for help[.]" One of the attackers grabbed Mr. Carpenter's cell phone and left the area. Mr. Carpenter testified that after his attackers left, he tried to crawl across the road to a house to seek assistance, but he was unable to rouse anyone from inside the house. He then tried to attract assistance by yelling "can anyone help me." Mr. Carpenter stated that two young children found him and sought help for him. Mr. Carpenter was taken to Akron General Hospital, where he stayed for two weeks.
 {¶ 16} Mr. Carpenter explained that the doctors placed two steel rods in his leg and "did the best they could to stitch up the hole where the bone come [sic] through and they stitched [him] up along the line of [his] left ear and across [his] forehead and they told [him] there really wasn't no way [sic] they could cast or wrap or anything for [his] ribs and [his] shoulder blade and all." In all, Mr. Carpenter testified that he suffered a "fractured shoulder blade, two broken ribs, compound fractured leg, fractured cheekbone, fractured chin, and a skull fracture." As a result of his injuries, Mr. Carpenter stated that after he left the hospital he was in rehabilitation for a month. He also stated that "[he] still walk[ed] with a limp. [He] can't put any weight on [his] leg."
 {¶ 17} Joyce Layton also testified at the bench trial. Mrs. Layton was the owner of Jo-Jo's Drive-thru in Barberton and she testified that she knew Appellant. Mrs. Layton described Appellant as a person who had the appearance of a homeless person and didn't have it "all together." She further explained: "I think [Appellant] says a lot of bologna. He exaggerates about things and I don't believe him when he says a lot of things. Like I don't pay attention to him."
 {¶ 18} As to the events that occurred on April 20, 2002, Mrs. Layton stated that she witnessed Appellant enter her business two times that day: once with an older woman that Appellant claimed was his wife; and the second time Appellant entered the drive-thru he was with a younger man that he said was his son. She witnessed Appellant purchase a 12-pack of beer sometime before 4:00 p.m. Mrs. Layton stated that when Appellant entered her store she noticed that "[h]e had a piece of wood, probably about that big, and he had like on a jacket where you stick your hands through like, you know, warmer, I guess. * * * [L]ike a pocket and he had the piece of wood inside of there[.]"
 {¶ 19} Patrick Goodman, Appellant's co-defendant and the man Mr. Carpenter referred to as the "younger guy" also provided testimony regarding the events that took place on April 20, 2002. Mr. Goodman testified that he, along with Appellant and Appellant's girlfriend, purchased a 12-pack of beer from Jo-Jo's Drive-thru. After buying beer, they then walked over to the towpath where Appellant and Appellant's girlfriend drank the beer; Mr. Goodman stated that he drank Dr. Pepper and smoked marijuana. Mr. Goodman further explained that after an hour and a half had passed, they noticed Mr. Carpenter fishing along the towpath. Mr. Goodman stated that Appellant told him: "I'm going to go take this dude's bike and fishing pole and take whatever money he had." Mr. Goodman stated that he observed Appellant walk over to a tree and break off a branch, which he started to smack with his hand. Mr. Goodman testified that he then observed Appellant approach Mr. Carpenter and he overheard Appellant ask Mr. Carpenter for spare change. Mr. Goodman overheard Mr. Carpenter tell Appellant: "I don't have nothing for you[,]" and Appellant respond: "Well, if you don't give me what you got, I'm going to throw you in the river."
 {¶ 20} Mr. Goodman testified that he saw Mr. Carpenter stab Appellant in the arm with a knife. Mr. Goodman saw Appellant bleeding and he pulled Appellant away from Mr. Carpenter. The two men headed in the direction of a nearby house and Mr. Goodman testified that he told Appellant to call the police. Mr. Goodman stated that he walked back to where Mr. Carpenter stood and that "[Mr. Carpenter] said that [Appellant] tried to rob him and he told me [Appellant] told him that if he didn't give him the money I would come — he was referring to me at the time, because he said his son would come down here and throw [him] in the water."
 {¶ 21} Mr. Goodman stated that after Mr. Carpenter explained to him what had occurred and apologized for his actions, Mr. Carpenter took off on his bike in Appellant's direction. Mr. Goodman testified that Appellant picked up a four-way lug wrench and Mr. Carpenter stopped his bike. While Mr. Carpenter was sitting on his bike, Mr. Goodman walked up behind Mr. Carpenter and "hit the dude in the back with the pipe because [Appellant] was scared. In the process of hitting the dude in the back, [Appellant] hits Mr. Carpenter four times in the head with the tire iron." Mr. Goodman stated that he only approached the two men because he was attempting to break up the fight, but "in the process of breaking it up [Mr. Carpenter] pulled a knife out and I turned around and I hit the dude in his leg, well, Mr. Carpenter in his leg with the pipe." Appellant then "smack[ed] [Mr. Carpenter] in the head with the tire iron. He didn't hit him with it. He threw it at him and it smacked him on the side of the head. [Appellant] picks [up the tire iron] and hit [Mr. Carpenter] again with it." Mr. Goodman stated that before leaving the scene of the attack, Appellant threw Mr. Carpenter's cell phone into the canal.
 {¶ 22} The investigating detective, Mr. Gerard Antenucci, also testified at trial. He testified that he learned Appellant was involved in the April 20, 2002, attack when he questioned Mrs. Layton and her husband at Jo-Jo's Drive-thru. He further testified that Mr. Carpenter identified Appellant and Mr. Goodman as his attackers from a photo array shown to him by the detective. Based on Mr. Carpenter's identification of Appellant as the perpetrator, Detective Antenucci stated that he arrested Appellant just as Appellant was attempting to receive his social security check in the Social Security office. Detective Antenucci testified that Appellant told him that "he often went to the canal, but he was there [on April 20, 2002,] because Patrick [Goodman] had thrown [Appellant's girlfriend's] belongings into the water several days previous during an argument and they were searching for her belongings, purse, clothing, what have you." Appellant also told the detective that:
"[W]hile searching for [Appellant's girlfriend's] belongings he was carrying a stick and he had been using it to drag through the water possibly to retrieve her purse or anything [Appellant] might find.
"[Appellant] said they weren't successful, in that he didn't find anything.
"[Appellant] said he came upon a guy fishing and he described him as a short dude with long white hair and a goatee. * * * [Appellant] said that he asked the man for a dollar and was refused.
"* * *
"[Appellant] said he was told by the male that the male didn't have any money and if he did have any he would give it to someone else.
"[Appellant] said immediately after being refused the money he was stabbed — the male took out a knife and started stabbing him.
"He said he was stabbed twice in the left arm by this subject while Patrick Goodman and [Appellant's girlfriend] stood by watching it."
"* * *
"[Appellant] walked away from the subject holding his arm and he wrapped his blue bandana around the wounds.
"He said that Goodman went ballistic on the male subject, ran up and hit him with a metal pipe that he had picked up."
 {¶ 23} Detective Antenucci further stated that Appellant told him that he was unable to remember all the events that took place on April 20, 2002, because he suffered a seizure after he was stabbed by Mr. Carpenter. The detective explained that Appellant told him that "[w]hen the seizures occur [Appellant] forgets things, he falls on the ground and flops like a fish." Appellant denied hitting Mr. Carpenter and he told the detective that Mr. Goodman "had done all the hitting." However, the detective testified that when he searched Appellant's room he found a wooden club that was approximately 12 to 18 inches long. The detective stated that he believed the club may have been used in the April 20, 2002, attack.
 {¶ 24} The detective also located and interviewed Appellant's girlfriend, Phyllis Johnson. The detective testified that Mrs. Johnson told him that she was with Appellant on April 20, 2002. She saw Appellant approach Mr. Carpenter for money and Mr. Carpenter stab Appellant. Mrs. Johnson told the detective that after Mr. Carpenter stabbed Appellant, she saw Appellant and Mr. Goodman hit Mr. Carpenter. Detective Antenucci stated that Mrs. Johnson told him "that as the male subject, Mr. Carpenter, rode up on his bicycle to the three of them, that he started to apologize to [Appellant] and at that point he did not see [Mr. Goodman] coming up behind him and [Mr. Goodman] assaulted him. Patrick screamed, `Why did you stab my dad?'"
 {¶ 25} The detective further testified that he believed that Mr. Carpenter's testimony and Mr. Goodman's testimony was consistent with the investigation that he conducted. Detective Antenucci did state, however, that there were "timeline differences" between Mr. Carpenter's testimony and Mr. Goodman's testimony.
 {¶ 26} Despite the fact that there was no physical evidence linking Appellant to the brutal attack on Mr. Carpenter, there was obviously a wealth of eyewitness testimony regarding Appellant's part in the attack. Although the testimony presented by Mr. Carpenter, Mr. Layton, and Mr. Goodman concerning the events that took place on April 20, 2002, were not perfectly in harmony, one thing is clear: Appellant hit Mr. Carpenter in the head with a lug wrench, which caused serious injuries to Mr. Carpenter's skull. We also find that the most damaging testimony that was presented at trial came from Appellant.
 {¶ 27} During the defense's case-in-chief, Appellant testified that he had been living on the streets of Akron, Ohio, for approximately four years. With regard to the afternoon in question, Appellant's version of the events is quite similar to Mr. Carpenter's version and Mr. Goodman's version. Appellant stated that Mrs. Layton purchased beer for Mr. Goodman and that they drank the beer under a bridge near the towpath. Appellant explained that after drinking the beer Mrs. Layton "passed out and went to sleep" and he went into a seizure. Appellant explained that Mr. Goodman "started beating [Mrs. Layton] because she — I had to go back later. I found her later after four days back downtown because I was — he told me he threw her in the canal."[2]
 {¶ 28} Appellant stated that later in the day, he saw Mr. Carpenter riding his bike and he "went to try to panhandle some money off the older man [and] he stabbed me." Appellant testified that he approached Mr. Carpenter, with a "little bitty" stick[3], and said: "Excuse me, sir, can you spare maybe a couple of dollars to help me out? I'm hungry." Appellant stated that Mr. Carpenter then reached "in his pocket and pull[ed] out a knife. I didn't see the knife, he was pretty quick, and it went right through a long john, a long sleeve shirt and a Mexican hoody with long sleeves. He started stabbing me. I couldn't get away from him." Appellant further explained that Mr. Goodman tried to stop Mr. Carpenter from causing Appellant further injury by telling Mr. Carpenter to "[s]top." Appellant stated that Mr. Goodman then grabbed Appellant's headband from around his head and used it to staunch the flow of blood streaming from his arm. Appellant stated that Mr. Goodman walked him back down the towpath and from there he could see Mr. Carpenter get back onto his bike and use a cell phone to call "the law." When Mr. Carpenter rode his bike past the men, Appellant stated that Mr. Goodman hit Mr. Carpenter with a pipe. He explained that Mr. Goodman hit Mr. Carpenter "right here on the back of the neck and the shoulder blade and started hitting him on his neck and I tried to get [Mr. Goodman] to stop and he steady beat me with the pipe." Appellant further explained that he "told [Mr. Goodman] that I wanted to go to the hospital and he said he would beat me with the pipe. He said I couldn't go to the hospital. I wasn't going to the hospital. He stopped beating him when I said that. He chased me up the road, he threw the pipe in the water and chased me up the road." Appellant stated that he did not remember hitting Mr. Carpenter with a tire iron; he stated that he only saw Appellant hit Mr. Goodman. Appellant did admit on direct, however, that he was responsible for throwing Mr. Carpenter's cell phone into the canal.
 {¶ 29} On cross-examination, Appellant admitted that he had been convicted on several burglary charges in Ohio and South Carolina. He also admitted that he did not suffer a seizure during the events that took place on April 20, 2002, despite the fact that he told Detective Antenucci that he could not remember anything that happened because of a seizure.
 {¶ 30} Despite Appellant's contention that he did not hit Mr. Carpenter in the head with a tire iron, the state presented testimony from Mr. Carpenter, Mr. Goodman and Detective Antenucci that Appellant did, in fact, hit Mr. Carpenter in the head. Appellant even testified that he saw Mr. Goodman hit Mr. Carpenter in the leg, back and torso; he never testified that he saw Mr. Goodman hit Mr. Carpenter in the head. However, Appellant failed to account for the head injuries that Mr. Carpenter suffered during the attack.
 {¶ 31} Although Mr. Carpenter and Appellant provided testimony that Mr. Goodman was the primary aggressor in the attack on Mr. Carpenter, it is evident that Appellant also took part in the attack and caused serious physical harm to Mr. Carpenter. Further, Mr. Carpenter presented testimony that as a result of being hit in the head, he suffered a fractured chin and forehead. As the evidence shows that Appellant was the only person that hit Mr. Carpenter in the head and that Mr. Carpenter suffered serious physical injuries as a result, we find that the evidence does not weigh heavily against the judgment and the trial court did not create "such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Otten, 33 Ohio App.3d at 340.
 {¶ 32} As to Appellant's claim that there was insufficient evidence for a jury to find him guilty, we note that this Court has previously held that a "defendant who is tried before a jury and brings a Crim.R 29(A) motion for acquittal at the close of the state's case waives any error in the denial of the motion if the defendant puts on a defense and fails to renew the motion for acquittal at the close of all the evidence." State v. Jaynes, 9th Dist. No. 20937, 2002-Ohio-4527, at ¶ 7, quoting State v. Miley (1996), 114 Ohio App.3d 738, 742.
 {¶ 33} At the close of the state's evidence, Appellant made a Crim.R. 29 motion and the trial court denied the motion, stating that there was sufficient evidence to submit the case to the jury. In response to the denial, Appellant's trial counsel stated: "Your Honor, I would ask to preserve my objection, ask the Court to note my continuing objection[.]" Appellant did not, however, renew the motion at the close of all the evidence; after Appellant presented a defense, he proceeded directly to closing arguments. As Appellant failed to preserve his right to appeal the trial court's denial of his Crim. R. 29 motion, we need not further address Appellant's assertion that there was insufficient evidence to prove that Appellant caused Mr. Carpenter serious physical harm or that Mr. Carpenter suffered serious physical harm. Accordingly, Appellant's first and second assignments of error are not well taken.
 Assignment of Error Number Three
"THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED [APPELLANT'S] RIGHT TO BE PRESENT AT ALL COURT PROCEEDINGS WHEN, AT A LATER DATE AND OUTSIDE THE PRESENCE OF [APPELLANT], IT MODIFIED ITS PRIOR IN-COURT RULING AND INDICATED WITHIN ITS JOURNAL ENTRY THAT [APPELLANT] MUST SERVE A TERM OF SEVEN YEARS FOR THE OFFENSE OF AGGRAVATED ROBBERY RATHER THAN A TERM OF SIX YEARS, AS STATED IN OPEN COURT."
 {¶ 34} In Appellant's third assignment of error, he has contended that the trial court abused its discretion when it modified Appellant's sentence outside of Appellant's presence. We agree.
 {¶ 35} Crim. R. 43(A) provides, in material part:
"The defendant shall be present at the arraignment and every stage ofthe trial, including the impaneling of the jury, the return of theverdict, and the imposition of sentence, except as otherwise provided by these rules. In all prosecutions, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the verdict." (Emphasis added.)
 {¶ 36} Pursuant to Crim.R. 43(A), a defendant has the right to be present during the imposition of his sentence. Moreover, Crim.R. 43(A) mandates that a defendant must be present even during the modification of his sentence. See State v. Ranieri (1992), 84 Ohio App.3d 432, 434. "[I]f the court determines that the sentence is to be corrected, [the defendant] is entitled to be present at a resentencing hearing." Statev. Sims (Feb. 20, 1997), 10th Dist. Nos. 96APA05-676, 96APA05-677, 96APA06-731, 1997 Ohio App. LEXIS 584, at *25. A trial court that imposes a sentence upon a defendant without the defendant being present, and such absence is not voluntary, commits reversible error. See State v. Welch
(1978), 53 Ohio St.2d 47, 48; Ranieri, 84 Ohio App.3d at 434. After reviewing the record, this Court finds that the trial court violated Appellant's Crim.R. 43(A) rights.
 {¶ 37} Immediately after the trial court found Appellant guilty of aggravated robbery and felonious assault, Appellant was sentenced. At the sentencing hearing, the trial court stated:
"The Court, in reflecting on an appropriate sentence in this case, in trying to do some kind of justice, I will tell you that in Count I [(aggravated robbery)] I'm going to sentence you to six years.
"I'll go over the reasons why in just a moment.
"I've indicated already that Count II [(robbery)], I believe would be a lesser and included and merge into Count I.
"Count III [(felonious assault)] I'm going to impose a six-year sentence and run those concurrently.
"Yes, the co-Defendant [(Mr. Goodman)] did receive four years; yes, arguably the co-Defendant struck more blows.
"The Court, in making a decision to sentence to you more time than the co-Defendant, does so not because you took this to trial, I'm giving you less time than the plea, but I'm doing it because I believe that you were the one that started it. I believe that you were every bit as involved.
"I don't buy all the — many of the — much of the statements that you made here today.
"* * *
"So, it's the sentence of this Court, the Court's going to impose a six-year sentence. Run it concurrently.
"Six years on each count, run it concurrently, give you credit for all time served. You're remanded into custody. That's it."
 {¶ 38} The trial court also found Appellant guilty of a probation violation. The Court then ordered that his sentence for aggravated robbery and felonious assault should run "consecutive with the community control" in another case.
 {¶ 39} The journal entry does not reflect the in-court proceedings that took place during the sentencing hearing. Instead of receiving six years on Count I and Count III, as the trial court indicated during the sentencing hearing, the journal entry states, in pertinent part:
"IT IS THEREFORE ORDERED AND ADJUDGED BY THIS COURT that the Defendant, JEFFREY K. MCMILLEN, be committed to the OHIO DEPARTMENT OF REHABILITATION AND CORRECTOIN for a definite term of Seven (7) years, which is not a mandatory term * * *, for punishment of the crime of AGGRAVATED ROBBERY, * * * and for a definite term of Six (6) Years, which is not a mandatory term * * * for punishment of the crime of FELONIOUS ASSAULT[.]"
 {¶ 40} Because the journal entry does not reflect the trial court's decision during the sentencing hearing, and the journal entry effectively enhanced Appellant's prison sentence, we find that the trial court committed reversible error. See Welch, 53 Ohio St.2d at 47; Statev. Bell (1990), 70 Ohio App.3d 765. We also note that the state agrees with Appellant's assertion that the trial court's judgment entry is erroneous. In its appellate brief, the state noted that on June 17, 2003, it filed a "motion for a limited remand" so that the trial court might clarify the sentencing discrepancies. Consequently, Appellant's third assignment of error is well taken.
 III {¶ 41} Appellant's first and second assignments of error are overruled; his third assignment of error is well taken. The judgment of the trial court is affirmed in part, reversed in part, and the matter is remanded for further proceedings consistent with this decision.
Judgment affirmed in part, reversed in part, cause remanded.
Slaby, P.J., and Batchelder, J. concur.
[1] Mr. Carpenter described a "four-way lug wrench" as "a tire iron, a four-way wrench for removing the lug nuts from a tire."
[2] Appellant first indicated the Mr. Goodman attacked Mrs. Layton on April 20, 2002. However, he later stated that Mr. Goodman's attack on Mrs. Layton took place two days before the April 20 attack on Mr. Carpenter.
[3] Appellant described the stick he was carrying as a "little bitty one[,]" but he also testified that he used the "little bitty" stick as a walking stick.